IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA       )
                               )
               v.              )   Criminal No. 17-313
                               )
CHRISTOPHER WOODS              )

**MEMORANDUM IN AID OF SENTENCING**

AND NOW, comes the defendant, Christopher Woods, by his attorney Jay J. Finkelstein, Assistant Federal Public Defender, and respectfully submits this Memorandum in Aid of Sentencing. In support thereof, counsel states:

I.  **BACKGROUND**

Christopher Woods is a 46 year old man with a lengthy work history, and he has been a long-standing productive member of society.  He made some horrible decisions during a difficult period in his life ultimately resulting in the instant charges of possession of a relatively small amount of images of child pornography.  He readily admitted his guilt when confronted by authorities.  Notably, he has been on bond since November 15, 2017 and has complied with all conditions of bond.

Chris was born in Montana, and his family moved around a lot due to his father's service in the Air Force.  At the age of one and a half years old, the family relocated to Jefferson City, Tennessee.  After two years, his family relocated to New

Market, Tennessee.  He moved to Knoxville, to attend college where he met his wife.  They moved to Pennsylvania for employment purposes.

Married in 1995, he and his wife have two children. Beginning sometime in 2010-2011, he and his wife began to experience marital problems, in part, due to his wife's mental health issues.  Chris worked full time, took care of his wife, children and household duties.  This led him to become depressed and he began to view adult pornography and ultimately child pornography.  To be clear, Chris takes full responsibility for his actions and as noted in paragraph 51 of the Report regarding his Psycho Sexual Evaluation, he does not blame his ex-wife for his conduct in this matter.  As explained in detail in the attached report, while **clearly** not an excuse, the loneliness and pressure that he felt helps to explain his behavior.

Chris has remained close to his parents and his brother Brian.  His father passed away at the beginning of this year. He has continued to visit his mother with the Court's permission on numerous occasions throughout the pendency of this matter.

Chris is currently is a long-term relationship with his girlfriend Molly Mazarini.  As stated in part in a letter address to the Court:

Dear Honorable Judge Conti:

I have been dating Chris Woods for over 2 years now – he is an amazing, loving, and caring man. One would think with everything that is happening – it would grow doubts. However, it does not. He went through an extremely difficult time with his divorce. I didn't know him at that time, but I know he is different person now. From what I've heard about his previous experience – that would be an extreme strain on anyone in the situation he was in. Now? I see his love for his children, his community, his family, and for me.

*          *          *

Chris' father passed away in January – while we made the arrangements to be in Tennessee he comforted his Mom and brother. He was a steady presence who everyone depended on while he was there. His father struggled for many years with Parkinson's disease – Chris was there from the beginning. Helping to decide course of care, making the decision about nursing care, and just loving his Dad through it all.

*          *          *

I know that he couldn't feel sorrier for what has happened but I also know in my heart this is something that would NEVER happen again. If you knew Chris, like I know him, you would see a family oriented, loving man who puts everyone above himself.  We all make mistakes we regret, and this is his biggest regret.

**(Pictures of Chris and Molly)**





A copy of this letter is attached hereto and marked as "Exhibit A."

Chris's mom, Pamela Woods, has also written to the Court. She states in relevant part:

Dear Honorable Judge Conti

Chris has always been one of the most loving and caring people I have ever known. You could ask anyone he went to school or worked with and

4

they would say the same thing. He was always
involved in every club and volunteer group going.
Also actively involved in band. I worked at a
nursing home for a couple of years and when Chris
saw how lonely the residents were there he
organized a volunteer team who did activities,
reading, mail and visits. This made a huge impact
on these residents lives!

\*          \*          \*

Chris' Dad was diagnosed with Parkinson's
Disease in 1987 so our lives have had many ups
and downs over the years. His last 8 years were
spent in a nursing home. I lost Robert January 1,
2018. Through all these years I truly don't know
what I would have done without Chris. For the
last 8 years I've been caring for my 88 year old
mother. Again Judge, Chris is my rock, I cannot
do this alone.

**(Chris with is mother and father)**



**(Chris and him mom)**



A copy of this letter is attached hereto and marked as "Exhibit B."

His brother Brian has also written to the Court.  In his letter, his brother Brian writes in relevant part:

> My name is Brian Woods and I am the brother of Christopher Robert Woods. I am forty one years old and Chris's younger sibling.
>
>       *            *            *
>
> I can't express what a wonderful brother he was to me. I can remember his interest and involvement 4-H and expressed by to me of how this program would help me as a young man not only to learn farming but also goal and family values. We grew up in a southern baptist church of which Chris was very involved in and became a junior deacon.
> Chris has been a great friend, colleague and someone to lean on for so many people over the years but I genuinely can say he has been the best brother anyone could ever ask for. He has

always been there for me during my life during
the good and the bad.

(**Chris and his brother Brian**)



A copy of this letter is attached hereto and marked as
"Exhibit C."

A copy of a letter written by Lee Saunders, an individual
attesting to Chris's good moral character and Christian faith is
attached hereto and marked as "Exhibit D."

Chris has a minimal criminal history with no countable
criminal history points which places him in Criminal History
Category I.  As noted in Paragraph 19 of the Presentence Report,
there were approximately 50 images of child pornography found on
Chris's electronic media.  This in comparison to the vast
majority of child pornography cases is an extremely low amount
of images that were possessed in this matter, a fact that the

Court should take into consideration in determining the
appropriate sentence for Chris.

Chris was evaluated by Dr. David Delmonico and Elizabeth
Griffin.  Dr. Delmonico and Ms. Griffin evaluate people accused
of child pornography offenses involving the internet. A copy of
the Report is attached hereto and marked as "Exhibit E."  As set
forth in length in the attached Report, the evaluation included
a personal interview, review of relevant documents, and the
results of multiple diagnostic tests.

The results of the evaluation found that:

**Pedophilic Disorder -** It is our opinion that
Mr. Woods does not meet the criteria for
pedophilic disorder and should not be
considered a pedophile, based on the
following:
- *Affinity* results indicated no sexual interest
in prepubescent children.
- *CASIC* score of two, indicating no pedophilic
interest
- No previous history of allegations /
convictions of sexually inappropriate
behaviors with prepubescent children.
- Sexual interest in adult females based on
Affinity results, history of a long-term
sexual relationships with adult women, and
self-report.
- No child seeking behavior (e.g., volunteering
with children other than his own, no child-
focused career)
- No evidence of chatting with a prepubescent
minor

**Diagnostic Impressions** – According to the
testing, clinical interview, and historical
information, it is our opinion that Mr. Woods
has no mental health diagnosis at this time.

It is important to note that Mr. Woods'
psychological testing did not indicate any
features or traits associated with an
antisocial personality disorder. Such findings
are relevant since an antisocial orientation
is often associated with a higher risk for a
future sexual offense.

**Psychology of the Internet / Online
Disinhibition Effect -** The Psychology of the
Internet and the Online Disinhibition Effect
impact the thoughts, decision, and behaviors
of individuals online.  They often engage in
online behaviors contrary to their offline
behaviors.  It is our opinion that the Online
Disinhibition Effect played a significant role
in Mr. Woods' online behavior and facilitated
the viewing of child pornography and
inappropriate chatting with other adult males.
Given other information collected for this
evaluation, our opinion is that Mr. Woods'
illegal online sexual behaviors are not
representative of his sexual interests, but
rather a product of the psychology of the
Internet.

Mr. Woods is an excellent candidate for
treatment based on the fact that he (a) admits
to wrongdoing and takes full responsibility
for his sexual behaviors, (b) is willing to
attend treatment, and (c) does not have a
diagnosis of antisocial personality disorder.
It is also our opinion that Mr. Woods will do
well on community supervision based on these
same characteristics.
**Risk Principle -** Research has demonstrated
that sentencing low-risk offenders to lengthy
sentences and highly restrictive environments
actually *increases* the likelihood of
recidivism and decreases the effectiveness of
treatment and community supervision. Mr. Woods
is a low risk sex offender and as such should
receive consequences commensurate with this
risk level.

> In Mr. Woods' case, he described himself
> as exhausted and depressed after years of
> being the functional partner in a relationship
> where his wife had significant mental health
> issues. Their relationship had deteriorated to
> the point that she [no] longer wanted to be
> with him.  The anger, resentment, and distress
> he experienced combined with the Online
> Disinhibition Effect significantly affected
> his judgement.

Counsel submits that for the reason set forth below, a substantial downward variance from the advisory guideline range is appropriate in this matter.

## II.   SUMMARY OF THE ARGUMENT

The United States Sentencing Guidelines are not mandatory; they are merely advisory and constitute only one factor in the sentencing analysis. <u>United States v. Booker</u>, 543 U.S. 220 (2005). District courts must sentence defendants according to the factors set forth in 18 U.S.C. § 3553(a) and, as the statute requires, impose a sentence that is **"sufficient, but not greater than necessary"** to comply with the purposes of sentencing.

Counsel asks this Court to consider both the legitimacy of the applicable Sentencing Guidelines in this case in addition to the case-specific mitigating circumstances. Even though Chris has zero criminal history points, the mechanical application of the child pornography Guidelines results in a draconian advisory guideline range of 70 to 87 months.  Based upon the results of the evaluation and his nature and characteristics, it is clear

10

that Chris is not a danger to society.  Such a high advisory

guideline range should be reserved for individuals that present

a significant risk to society.  Situations like Chris's have led

to Courts in this district and across the United States having

to recognize that the child pornography guidelines are not the

result of the Sentencing Commission's careful review of

empirical data and national experience and have led Courts to

grant significant variances from the advisory guideline range.

As such, counsel is requesting a substantial variance from the

advisory range.


   **III.  <u>THE GUIDELINE RANGE</u>**

According to the PSR and its Addendum, the following are

potentially applicable technical provisions of the advisory

sentencing guidelines:

A base offense level of 18 for possession of child

pornography. PSR ¶ 30; U.S.S.G. § 2G2.2(a)(1).

A 2 level increase for possessing images of prepubescent

minors. PSR ¶ 31; U.S.S.G. §2G2.2(b)(2).

A 2 level increase for distribution other than distribution

described. PSR ¶ 32; U.S.S.G. § 2G2.2(b)(3)(F).

A 4 level increase for depictions of sado-masochistic

conduct or images of violence. PSR ¶ 33; U.S.S.G. § 2G2.2(b)(4).

A 2 level increase for use of a computer. PSR ¶ 34; U.S.S.G. § 2G2.2(b)(6).

A 2 level increase for having at least 10 but fewer than 150 images. PSR ¶35; U.S.S.G. §2G2.2(b)(7)(D).

The resulting offense level, if this Court finds all the above enhancements to apply, would be 30.  After applying a 3 level reduction for acceptance of responsibility, the offense level would then be 27.  Even with a Criminal History Category of I, the advisory guideline range in this is still 70-87 months.

Counsel submits that this is advisory range is clearly **greater than necessary** to meet the goals of sentencing. In short, the advisory guideline range fails to reflect the 18 U.S.C. § 3553(a) factors and has little to no value in assisting this Court in achieving a fair and just sentence.

**IV.  A SUBSTANTIAL VARIANCE IS WARRANTED FROM THE ADVISORY GUIDELINE RANGE IS APPROPRIATE IN THIS CASE**

As set forth above, the sentencing enhancements in this case are found in almost every child pornography cases and the mechanical application of the guidelines result in the application of these enhancements resulting in a guideline range of 70-87 months.

Thus, for the reasons set forth below, however, and has found by Courts in this district and across the United States, the child pornography guidelines should be afforded less weight normally afforded the guidelines which, as the Court is aware, are advisory only.  Counsel submits that a substantial variance is appropriate in this matter.

**1. The Advisory Guideline Range is Driven by Unduly Harsh Enhancements That Lack Empirical Support And Should Be Disregarded.**

Since its decision in United States v. Booker, 543 U.S. 220 (2005), the Supreme Court has clarified the procedure sentencing courts must follow when embarking on the serious task of sentencing people. It has also clarified the role of the guidelines as advisory and noted that with certain offenses, the Guidelines Manual may be less relevant than it would be for other offenses.  See Kimbrough v. United States, 552 U.S. 85, 110 (2007).

The Third Circuit has recognized that the guideline section that applies to child pornography offenses like the instant case, **"was not developed pursuant to the Commission's institutional role and based on empirical data and national experience."**  United States v. Grober, 624 F.3d 592, 608 (3d Cir. 2010).

In sentencing Chris, it is important for this Court to recognize, as both the Third and Second Circuit Courts of Appeals have, that the child pornography guidelines are "fundamentally different from most and ... unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." United States v. Dorvee, 616 F.3d 174, 184(2d Cir. 2010). See also, United States v. Jenkins, No. 14-4295-CR (2d Cir. 2017); See also United States v. Tutty, 612 F.3d 128, 133 (2d Cir. 2010) (directing the district court to "bear in mind that the 'eccentric' child pornography Guidelines, with their 'highly unusual provenance,' 'can easily generate unreasonable results' if they are not 'carefully applied.'")(internal citations omitted); United States v. Grober, 595 F. Supp.2d 382, 412 (D. N.J. 2008) ("[T]he Court joins thoughtful district court judges whose work has convinced them that the present guideline, 2G2.2, must be given less deference than the guidelines traditionally command.").

In this case, Chris should be sentenced to significantly less than the advisory guideline range because, based upon the reasoning in Kimbrough, Dorvee, and Grober, the child pornography guidelines are not the result of careful review of empirical data and national experience, mandate application of a number of "enhancements" which apply in nearly every case.

14

According to the United States Sentencing Commission statistics for 2013, three of the specific offense characteristics that apply in this case applied in the majority of federal child pornography cases. The use of a computer enhancement applied in 95.3% of cases; the depiction of a minor under the age of 12 applied in 96.1% of cases; the number of images enhancement applied 79% of cases. United States Sentencing Commission, "Use of Guidelines and Specific Offense Characteristics: Guideline Calculation Based" at   p.40-41(Fiscal Year 2013).

Because the specific offense characteristics applicable in this case are applicable in nearly all child pornography cases, they do nothing to distinguish this offense from other defendants and offenses. The applicable, and "essentially inherent" enhancements that "apply in nearly every case" should be discounted by this court. See United States v. Grober, 624 F.3d 592, 597 (3d Cir. 2010); see also United States v. Dorvee, 616 F.3d 174, 187 (3d Cir. 2010)("[M]any of the § 2G2.2 enhancements apply in nearly all cases.").

In Grober, the Third Circuit held that sentencing courts may depart from the "draconian" child pornography guideline range in cases where they find a policy disagreement with U.S.S.G. 2G2.2.  See Grober, 624 F.3d at 596, 609. In Grober, the Third Circuit considered the vast record developed at the sentencing hearing, where evidence was taken for twelve days

addressing the origin of the child pornography guidelines. Id.,
624 F.3d at 595. After carefully reviewing the evidence, reading
submissions, and hearing oral argument, the district court
determined that it would vary from the advisory guideline range
because it had a policy disagreement with 2G2.2. See id., 624
F.3d at 599-600. Thus, the district court sentenced the
defendant to the mandatory minimum term of confinement of 60
months for the receipt, possession, and transportation of child
pornography. Id. at 596. The guidelines, however, provided for a
range of 235-293 months' incarceration. Id. at 599. The Third
Circuit upheld the district court's decision because the court
provided a "sufficiently compelling explanation for its policy
concerns about 2G2.2 and its justification for imposing a
sentence outside the range 2G2.2 recommended." Id. at 611.

The child pornography guidelines are not the result of a
careful study and review of empirical evidence by the Sentencing
Commission. Indeed, the Sentencing Commission noted in a 2009
Report how many of the "dramatic[]" increases in the child
pornography guidelines were as a result of politics and
Congressional mandates. See United States v. Grober, 624 F.3d
592, 604 (3d Cir. 2010). As a result of these mandates – not
empirical data – the base offense level has sky-rocketed over
the years and a number of enhancements were added even though

16

they apply in nearly every case and, thus, fail to provide meaningful distinctions.

A history of U.S.S.G. §§ 2G2.2 and 2G2.4 is provided in Assistant Federal Public Defender Troy Stabenow's "Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines." (Attached hereto and marked as "Exhibit F"). The article examines how the guidelines have been altered to produce vastly enhanced penalties, creating "policy problems" which run counter to the intent of the Sentencing Commission and Congress:

> **First**, the guidelines have been repeatedly raised despite evidence and recommendations by the Commission to the contrary. **Second**, repeated Congressional directives were targeted to deter mass producers, repeat abusers, and mass distributors, but this group makes up less than 5% of the defendants effected by the changes. **Third**, the two point enhancement for use of a computer is applied to nearly every defendant, but the rationale for creating and continuing the enhancement is rarely present. **Fourth**, the latest, and most dramatic changes to the Guidelines result not from study by the Commission, nor debate in Congress, but instead by the actions of two unknown authors within the Department of Justice.

Id. at p. 35 (emphasis added).

Because the child pornography guidelines were developed outside the Commission's traditional role and without study and analysis, and because these enhancements apply in nearly every child pornography case, thus, failing to distinguish offenses at

all, this Court should reject the guidelines here. In the alternative, it should afford the guidelines less weight in the overall analysis of the Section 3553(a) factors.

**a) THE BASE OFFENSE LEVEL FAILS TO REFLECT NATIONAL EXPERIENCE NOR IS IT BASED ON EMPIRICAL DATA**

When Congress made it illegal to possess child pornography in November 1990, the Sentencing Commission needed to decide how it would deal with such offenses in the Guidelines. A new Guideline section was created, U.S.S.G. § 2G2.4 (1991). See U.S.S.G. Appendix C, Amendment 372. The Commission believed that possessing, receiving, and transporting child pornography (which were considered offenses that are "logical predicates" of each other) should appropriately be sentenced under this new Guideline; offenses relating to distribution of and possession with intent to sell child pornography should be dealt with under the already existing, more harsh U.S.S.G. § 2G2.2. See "Deconstructing the Myth" at pp. 4-5.

The base offense level of the newly created § 2G2.4 was set at 10, see U.S.S.G. § 2G2.4(a)(1991) – the highest of the alternative offense levels considered by the Commission in their decision-making process. Unfortunately, this "carefully studied plan" was rejected by Congress in October 1991 without *any* study, analysis or debate.  By mischaracterizing what the

Commission had done, certain Senators discreetly pushed through a bill directing that receipt and transportation of child pornography be dealt with under the harsher § 2G2.2. The bill also required expanded enhancements to both §§ 2G2.2 and 2G2.4. Id. Over the strenuous objection of the United States Sentencing Commission, the bill was passed with little accurate discussion and no debate at all. "Deconstructing the Myth" at 5-8. The Congressional action "was nothing less than a rejection of the empirical, studied approach to child pornography sentencing." Id. at 8.

As a result of the passage of this unexamined legislation, the Sentencing Commission was required to alter the base offense level of § 2G2.2 (which, as a result of the bill, now included the crimes of receiving and transporting, as well as distributing child pornography) from 13 to 15. Having modified § 2G2.4 to address only the crime of simple possession of child pornography, Congress also forced the Commission to increase the base offense level for simple possession (§ 2G2.4) from 10 to 13. See U.S.S.G. Appendix C, Amendments 435, 436.

But Congress continued to issue poorly researched and unfounded directives to the Sentencing Commission. In March 1995, the House of Representatives passed a bill that was intended to increase the sentences of those who create or traffic child pornography, especially for profit. Though

19

discussion on the House floor was limited to producers and traffickers, the Senate later expanded the bill's reach to include all child pornography offenses. "Deconstructing the Myth" at p. 11 (citing 141 Cong. Rec. H14319-02). Id. The Commission was forced again to respond by increasing the base offense level in both §§ 2G2.2 and 2G2.4. The base offense level for possession of child pornography (§ 2G2.4) was increased from 13 to 15. See U.S.S.G. Appendix C, Amendment 537.

The final increase in the base offense level for possession of child pornography was a reaction to the PROTECT Act, which drastically restricted federal sentencing discretion and adjusted the mandatory minimum and statutory maximum sentences for certain child related offenses. See e.g., Public Law 108-21, Title IV. It is now common knowledge that the sentencing Guideline section of the PROTECT Act was authored by two DOJ officials. The sponsor of these provisions, a freshman Congressman named Feeney, was, as he later put it, "just the 'messenger.'" "Deconstructing the Myth" at 20. Much like other Congressional sentencing provisions relating to child pornography, this section of the PROTECT Act received virtually no attention or debate. Id. at 20.[1]

---

[1] For an excellent summary and discussion of the PROTECT Act's impact on the Federal Sentencing Guidelines, see United States v. Detwiler, 338 F.Supp.2d 1166, 1170-72 (D. Or. 2004). See also Sigmund G. Popko, Throwing the Book at Sentencing Appeals,

After Congress passed the Act, its drastic meddling in the Guidelines caused the Commission to merge U.S.S.G. § 2G2.4 into U.S.S.G. § 2G2.2. This, despite the fact that in a 1996 Report to Congress, the Commission said that consolidation of these two guidelines would be unwise; doing so would result in severe sentencing enhancements from § 2G2.2 applying to cases of simple possession. <u>See</u> Report to Congress, Sex Offenses Against Children, 1996 at 13. Ultimately, in completing the consolidation, the base offense level for possession increased from 15 to 18, again, in response to Congress's unstudied actions. <u>See</u> U.S.S.G. Appendix C, Amendment 664.

In sum, having begun at a Base Offense Level of 10 – a number based on Commission-sponsored empirical study, the base offense level for the guideline applicable to Chris today begins at 18. After overly-broad and misinformed directives from Congress, the base offense level alone was ratcheted upward 8 levels. The effect on the calculated sentence is a perfect example of a formula <u>not</u> driven by expert analysis, but Congressional overreaching and DOJ authored guideline directives.

---

38 Ariz. St. L.J. 483, 510 n.176 (2006) (citing additional sources therein).

**b) THE "USE OF A COMPUTER" ENHANCEMENT IS DOUBLE COUNTING AND OVERSTATES SERIOUSNESS OF THE OFFENSE.**

Numerous courts in this district and elsewhere have acknowledged that the computer enhancement results in double counting and overstates the seriousness of the offense and should not be applied, and have varied downward based upon this basis.  This enhancement applies in almost all § 2G2.2 cases. "The Internet has become the typical means of obtaining child pornography, and Internet child pornography cases are essentially the only kind of child pornography crime prosecuted in federal court." United States v. Howard, 2010 WL 749782, at *10 (D. Neb. 2010).

This enhancement also has a "flavor of impermissible 'double counting'-because it effectively 'increase[s] a defendant's sentence to reflect the kind of harm that has already been fully accounted for' by the base offense level or other enhancements." United States v. Tutty, 612 F.3d 128, 132 (2d Cir. 2010). As such, the computer enhancement should be disregarded, and the Court should not apply this enhancement or, in the alternative, vary downward on this basis.

**c)   THE "IMAGES" ENHANCEMENT LACK EMPIRICAL SUPPORT, IS NOT JUSTIFIED BY THE COMMISSION'S EXPERTISE, AND OVERSTATES THE SERIOUSNESS OF THE OFFENSE.**

"Because of the unfortunate ease with which large numbers of images can be accessed and stored, most child pornography offenders are subject to enhancements from two to five levels for the number of images." Howard, 2010 WL 749782, at *10 (D. Neb. 2010). See also United States v. Hanson, 561 F. Supp. 2d 1004, 1009 (E.D. Wis. 2009) ("given the unfortunate ease of access to this type of material in the computer age, compiling a collection with hundreds of images is all too easy, yet carries a 5 level enhancement"). High speed internet access allows someone to passively download massive amounts of files in mere minutes with few steps and little to no deliberation. Therefore, unlike quantity-based enhancements in a drug-distribution scheme, in child pornography cases, "the number of images does not provide the distinction between a large-scale and a small-scale child pornography purveyor that Congress and the Sentencing Commission must have envisioned when promulgating this market-based and quantity-driven scheme." Howard, 2010 WL 749782 at *10; see also Marshall, 870 F. Supp. 2d 489, 493-94 (N.D. Ohio 2012) (the enhancements for use of a computer and number of images "are unsupported by empirical research, skew almost all child pornography receipt and possession cases upward and fail to provide meaningful separation of offenders," and

23

fail "to distinguish defendants who are a threat to the community from those who are not."). Rather, "the number of images a defendant possesses is meaningless as an indicator of his position in a distribution hierarchy." <u>Howard</u>, 2010 WL 749782 at *10. "Whatever connection there may be between a defendant's relative guilt and the number of images he possesses, an enhancement of up to five levels overstates that connection." <u>Id.</u> Thus, the "enhancements for use of a computer and number of images lack value as a reliable proxy for culpability and are a poor gauge of relative levels of fault between offenders." <u>Id.</u>

Additionally, the math underlying this enhancement – equating one video to 75 images – is based on neither empirical data nor technology.

Finally, this enhancement is a prime example of a "specific offense characteristic" that is divorced from any empirical or expert justification. With the passage of the PROTECT Act, Congress took the unprecedented step of drafting the guideline language itself, jettisoning the Sentencing Commission altogether:

> Congress directly amended [for the first time]
> the Federal Sentencing Guidelines by drafting
> Guideline text.  In the past, Congress often . .
> . issue[d] directions to and requests for study
> from the Commission, but left it to the
> Commission to craft specific Guideline text.
> This time, Congress completely ignored the

> expert role the Sentencing Commission was
> designed to play, cut the Commission out of the
> process entirely, and directly wrote Guideline
> text to its own specifications.

Steven L. Chanenson, *Hoist With Their Own Petard?*, 17 Fed. Sent'g Rep. 20, 23 & nn.54-57 (2004) (emphasis original); see also Detwiler, 338 F.Supp.2d at 1171. Like other sentencing provisions of the PROTECT Act, this enhancement was written by two Department of Justice lawyers and introduced by Representative Feeney without any meaningful scrutiny or analysis. Neither the Judicial Conference or the Sentencing Commission were given "a fair opportunity to consider and comment" on the amendment. See Chanenson, 17 Fed. Sent'g Rep. at n.56 (citing*,* e.g*.,* Letter from the Judicial Conference of the United States to Senator Orrin G. Hatch (April 3, 2003), *reprinted at* 15 Fed. Sent'g Rep. 343, 343 (2003)).[2]

One of these direct amendments to the Guidelines was the inclusion of § 2G2.2(b)(6) and § 2G2.4(b)(5), which is the present-day U.S.S.G. § 2G2.2(b)(7). See U.S.S.G. Appendix C,

---

[2] See Popko, 38 Ariz. St. L.J. at 510 n.176 (The sentencing aspect of the Act "originated as a floor amendment to an 'Amber Alert' bill then being considered by the House of Representatives."); see also Sandra D. Jordan, *Have We Come Full Circle? Judicial Sentencing Discretion Revived in* Booker *and* Fanfan, 33 Pepp. L. Rev. 615, 658 n.304 (2006) ("The Feeney amendment to the PROTECT Act was included with a very popular provision . . . known as the "Amber Alert" bill.").

Amendment 649. "No research, study, body of experience, or rationale, was provided to justify the arbitrary specific offense enhancement amounts, nor the choice of the triggering quantities for the two to five point enhancement relating to the number of images of child pornography."  The enhancement based on the number of images possessed simply bears no studied relationship to the statutory purposes of sentencing.  While Chris has possessed a relatively small amount of images, counsel submits that the two level increase still results in a overstatement of the offense in this matter.

**d)   THE DISTRIBUTION ENCHANCEMENT LACKS EMPIRICAL SUPPORT AND OVERSTATES THE SERIOUNESS OF THE OFFENSE**

Another § 2G2.2 factor which over-represents the gravity of the underlying facts relates to the 2 level increase in the offense level and the two level enhancement for the possible aspect of internet technology.

Chris had downloaded a file sharing application which allowed him to view many things, including piano music, television shows, movies and adult pornography.  This application, however, allows for other to view or "share" any files Chris viewed.  As such, a number of the images in Chris's' "file-sharing set" were otherwise already in the "stream" of internet commerce before Chris joined the file-sharing network.

As such, his membership in that network did nothing to make images-- that were otherwise in another file-sharing member's set before Chris joined the file-sharing network--available to someone else.  As such, an increase to the offense level for file-sharing is unwarranted in this case, and it only serves to heighten an already draconian offense level.

**V.   APPLICATION OF 18 U.S.C. § 3553(a) SUPPORTS A SENTENCE FAR BELOW THE ADVISORY GUIDELINE RANGE**

Title 18, Section 3553(a) provides that, in addition to the applicable guideline range and Sentencing Commission policy statements, district courts are required to consider the history and characteristics of the defendant, the nature and circumstances of the offense, the kinds of sentences available, the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to victims of the offense. 18 U.S.C. § 3553(a)(1), (3), (4),(5),(6), and (7).

In addition, under 18 U.S.C. § 3553(a)(2) district courts must impose a sentence "sufficient, but not greater than necessary" to comply with the need for the sentence:

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)   to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Counsel submits that for the reason set forth in detail below, a significant downward variance from the draconian advisory guideline range of 70-87 months is sufficient but not greater than necessary to meet the goals of sentencing.

### A.    CHRIS'S HISTORY AND CHARACTERISTICS

Chris is a 46 year old man with no countable prior criminal history.  He is a college graduate and has a lengthy work history.  He has a close relationship with his mother and brother, and two children from his marriage.  As noted above, he is in a long-term relationship.  Letters from his mother, brother and girlfriend attest to Chris's true nature and history and characteristics.

As set forth in the evaluation, it found that Chris is **NOT** a pedophile, and concludes that he needs community based treatment and not lengthy incarceration.  Notably, he is deemed to be at a low risk of recidivism.  In fact, the evaluation cautions that in dealing with a low risk offender like Chris, a lengthy sentence of incarceration may serve to increase the risk

of recidivism and decreases the effectiveness of treatment and community supervisor.  See IBC Evaluation, at page 3, Exhibit E.

Accordingly, counsel is requesting a significant downward variance from the advisory guideline range.


### B.    THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

While this is a serious offense, but the Court should not be "so appalled by the offense that it los[es] sight of the offender." United States v. Olhovsky, 562 F.3d 530, 549 (3d Cir. 2009).  Rather, the Court should take all the facts into consideration and fashion a sentence that is sufficient but not greater than necessary to meet the goals of sentencing.

Additionally, as stated above, Chris possessed a relatively low amount of images compared to the majority of cases in this district and elsewhere.


### C.    THE KINDS OF SENTENCES AVAILABLE

There is no mandatory minimum sentence in this case. Neither the statute nor the Guidelines prohibit a sentence of probation under these circumstances. A term of probation of between one and five years is permitted. See 18 U.S.C. §3561(c)(1). The sentencing options available to the court include permutations of the following variables: a period of probation; home incarceration, custody followed by supervised

release. Chris also faces up to a life term of supervised release and lifetime registration. See 18 U.S.C. 3583(k). Thus, this Court, for example, may order a longer period of supervision and impose a nominal term of confinement. Significantly, if supervision is ordered, this Court can impose conditions of supervision, including home detention, computer restrictions, and sex offender treatment.

**D)   APPLICABLE COMMISSION POLICY STATEMENTS**

Consideration of Commission policy statements also weigh in favor of a sentence significantly below the advisory guideline range in Chris's case. In its 2013 Annual Report, the United States Sentencing Commission noted that "most stakeholders in the federal criminal justice system consider the non-production [child pornography] sentencing scheme to be out-moded." United States Sentencing Commission Annual Report 2013, Ch. 2, at A-8-9. The Commission goes on to highlight that guideline range sentences are decreasing in non-production child pornography cases while sentences below the guidelines for reasons other than providing substantial assistance to authorities has "significantly increased." Id. In justifying its recommendations to Congress to enact legislation authorizing the Commission to amend the child pornography guidelines that were promulgated pursuant to Congressional directives, it also explained:

30

The Commission found that most stakeholders
believe that the sentencing scheme in non-
production cases no longer adequately
distinguishes among offenders based on their
degree of culpability or sexually dangerous
behavior because of recent changes in computer
and Internet technologies. As a result courts
and parties in non-production cases have limited
the sentencing exposure for some offenders
through charging and sentencing practices.
Inconsistent application of guideline and
statutory penalty provisions has led to growing
disparities in sentencing among similarly
situated child pornography offenders.

The Commission found that the rate of known
general recidivism of offenders sentenced under
the non-production guidelines was similar to the
rate of known general recidivism by a comparable
segment of the entire federal offender
population. The Commission cited emerging
research indicating that child pornography
offenders with clinical sexual disorders may
respond favorably to treatment, particularly if
administered as part of a 'containment model'
involving cooperation among treatment providers,
polygraph examiners, and probation or other
supervising officers.

Id.

In addition to policy statements concerning problems with

the current child pornography possession guidelines, the

Commission has issued policy statements regarding prison

resources. In January 2009, the Commission issued a report

entitled Alternative Sentencing in the Federal Justice System

("Report"), available at

http://www.ussc.gov/Research/Research_Projects/Alternatives

/20090206_Alternatives.pdf. Therein, the Commission emphasizes

31

that the Sentencing Reform Act of 1984, which provides the

"foundation" for federal sentencing policy, "requires that the

federal sentencing guidelines 'reflect the general

appropriateness of imposing a sentence other than imprisonment

in cases in which the defendant is a first offender who has not

been convicted of a crime of violence or an otherwise serious

offense . . ."  Report at 2.  Further, in providing the

background for the Report, the Commission states:

> Increasingly, criminal justice professionals
> have argued that dwindling prison space should
> be reserved for the most serious and dangerous
> offenders, necessitating a reconsideration of
> alternative sanctions for first-time and non-
> violent offenders.  The appeal of alternatives
> to incarceration has continued to increase in
> the wake of reports of the ever-growing prison
> population.  As of 2008, more than one in every
> 100 adults are incarcerated in the United
> States.  That large, and still growing,
> population cost the states more than $49 billion
> in 2007.  In addition to the monetary costs,
> social costs of imprisonment include the
> separation of families, isolation from the
> community, and transitional difficulties when
> offenders re-enter the community.

Report at 1-2.  The Report concludes:

> Effective alternative sanctions are important
> options for federal, state, and local criminal
> justice systems.  For the appropriate offenders,
> alternatives to incarceration can provide a
> substitute for costly incarceration.  Ideally,
> alternatives also provide those offenders
> opportunities by diverting them from prison (or
> reducing time spent in prison) and into programs
> providing the life skills and treatment
> necessary to become law-abiding and productive
> members of society.

Report at 20.

Chris cannot be counted among "the most serious and dangerous offenders" for whom federal prison space should be allocated.  Given the Commission's own reports, consideration of this factor weighs in favor of a sentence significantly below the advisory guideline range in this case to a non-incarceration type sentence.

**E)    THE NEED TO AVOID UNWARRANTED DISPARITIES**

This Court must also consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The unreasonable harshness of the Guidelines for an offense of possession of child pornography, of which Chris is charged, has been recognized by courts across the country. In 2012, only 35% of federal child pornography defendants (including offenders convicted of more serious child pornography offenses, such as production of child pornography) received sentences within the guideline range. U.S. Sentencing Commission 2012 Sourcebook of Federal Sentencing Statistics at 27A. In 2012, child pornography was the offense "with the highest rate of non-government sponsored below range sentences." U.S. Sentencing Commission's 2012 Annual Report at 44. Indeed,

federal sentencing statistics show that district courts impose below Guideline sentences in a significant majority (65.75%) of § 2G2.2 cases, when downward departures and <u>Booker</u> variances are combined. <u>http://www.ussc.gov/ANNRPT/2009/SBTOC09.htm</u>See U.S. Sentencing Guideline 2012 Sourcebook of Federal Sentencing Statistics at Table 28.

Courts across the country have imposed non-incarceration and nominal incarceration sentences where warranted.  The United States Sentencing Commission performed a survey of federal judges as to the appropriate various guideline ranges. **Seventy percent of the judges responding to the survey found that the guidelines for possession of child pornography were too high.** See Exhibit D; <u>see</u> <u>also</u>, <u>United States v. Bidondi</u>, No.10-190ML (D. R.I.  Mar. 29, 2012)) (**one day incarceration followed by twelve months of home detention where guideline range was 78 to 97 month**); <u>United States v. Stall</u>, 581 F.3d 276 (6th Cir. 2009) (affirming **one day incarceration followed by ten years supervised release** in child pornography possession case where Guideline recommended term of 57 to 71 months imprisonment); <u>United States v. Rowan</u>, 530 F.3d 379 (5th Cir. 2008) (affirming **five years of probation and no period of incarceration** where Guidelines suggested a term of 45 to 57 months imprisonment); <u>United States v. Prisel</u>, 316 Fed. Appx. 377 (6th Cir. 2008) (affirming **one day incarceration followed by 18 months of home**

34

**confinement** rather than Guideline range of 27 to 33 months in possession of child pornography case); United States v. Polito, 215 Fed. App'z 354, 356 (5th Cir. 2007) (affirming **five years of probation with 12 months of house arrest** in a child pornography cases); United States v. D.M., 2013 WL 1846543 (E.D.N.Y. May 3, 2013) (defendant who plead guilty to possession of child pornography received a **non-incarceration sentence** where Guidelines recommended 78 to 97 months imprisonment); United States v. Mood, 2010 WL 3000060 (E.D. Mich. 2010) (sentencing defendant to **one day incarceration followed by five years supervised release** where Guideline recommended 57 to 71 months incarceration); United States v. Meillier, 650 F. Supp. 2d 887 (D. Minn.2009) (imposing non-Guidelines sentence of **one day of confinement followed by thirty years of supervised release**); United States v. Boyden, 2007 WL 1725402, at *10 (E.D. Mich. June 14, 2007) (imposing non-Guidelines sentence of one day of confinement followed by three years of supervised release, the first year of which to be served in a community correctional facility). See also United States v. Morace, 594 F.3d 340, 351 n. 10 (4th Cir. 2010) (noting "that some district courts have begun sentencing defendants convicted of possessing child pornography to one day of incarceration followed by a term of supervised release").

Additionally, a number of judges in this district, have sentenced defendants below the advisory Guideline range in child pornography cases. See, e.g., United States v. Matthew Sible, Crim. No. 16-90 (Ambrose, J.), (imposing a sentence of 18 months, where the guideline range was 97-121 months). United States v. Smith, Crim. No. 12-83 (Cohill, J.) (imposing sentence of one day in the custody of the U.S. Marshal and a ten year term of supervised release where guideline range was 78-97 months); United States v. Matthew Jankowski, (Diamond, J.) varying downward from an advisory range of 63-78 months to a year and a day of incarceration.  United States v. Cotter, Crim. No. 09-190 (Diamond, J.) (varying downward from 37 to 46 months advisory range to 5 years of probation with the condition of community confinement for one year); United States v. Miller, Crim. No. 11-181 (Fischer, J.) (imposing sentence of 12 months and one day imprisonment where guideline range was 63 - 78 months); United States v. Monticue, Crim. No. 11-25 (Cercone, J.) (imposing sentence of 12 months and one day incarceration where guideline range was 97-121 months);  United States v. Asburay, Crim. No. 10-0006 (W.D. Pa.) (McVerry, J.) (sentencing defendant to five years probation for possession of child pornography); United States v. Rice, Crim. No. 09-46 (W.D. Pa.) (McLaughlin, J.) (sentence of 10 months imposed rather than Guideline sentence of 33 to 41 months). Given the prevalence of

below Guideline sentences, including non-incarceration terms, and the reasons for a substantial downward variance in this case would not result in an unwarranted disparity. To the contrary, a sentence within the guidelines would result in an unwarranted disparity.

**F)   PURPOSES OF SENTENCING**

A sentence below the advisory guideline range in Chris's case also comports with the purposes of sentencing, as set forth in § 3553(a)(2).  Indeed, consideration of the enumerated purposes of sentencing -- to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense and to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant -- weighs in favor of imposing a sentence far below the advisory guidelines range.

Possessing child pornography is a serious offense. "Respect for the law is promoted by punishments that are <u>fair</u>, however, not those that simply punish for punishment's sake." <u>United States v. Stern</u>, 590 F.Supp.2d 945, 956-57 (N.D. Ohio Dec. 19, 2008) (emphasis in original, citations omitted). A sentence that is too high promotes disrespect for the law just as a sentence that is too low.  <u>Cf</u>. <u>id</u>. ("There is no reason to believe that respect for the law will increase if a defendant

who deserves leniency is sentenced harshly any more than there is reason to believe that respect for the law will increase if a defendant who deserves a harsh sentence receives a slap on the wrist.") (citations omitted). See also, United States v. Ontiveros, 07-CR-333, 2008 WL 2937539, at *3 (E.D.Wis. July 24, 2008) ("[A] sentence that is disproportionately long in relation to the offense is unjust and likewise fails to promote respect [for the law].").

A significant downward variance from the guidelines, for example, along with a broad array of restrictions, shame, and a lifetime of collateral consequences including Megan's law registration as well as now being a felon, reflects the seriousness of the offense. See Lawrence v. Texas, 539 U.S. 558, 575 (2003) (the "stigma" imposed "is not trivial"); United States v. Mateo, 299 F. Supp. 2d 201, 209–10 (S.D.N.Y. 2004) ("[B]eyond the offender's actual deprivation of liberty when incarcerated, a host of other penalties and burdens always attend criminal conviction, to name a few: losses of family life, of socioeconomic status, of employment and career opportunities; diminution of certain civil rights and entitlements; and countless humiliations and indignities commonly associated with living in confinement.").

As a result of this offense, Chris will be a felon and will be required to register as a sex offender. His ability to live his life is irreparably diminished. His freedom can be restricted by a term of home-confinement and supervision imposed by this Court. Gall v. United States, 552 U.S. 38, 48 n.4 (2007) ("Probation is not granted out of a spirit of leniency . . . . [] probation is not merely 'letting an offender off easily.'") (citing Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13-14 (1957)). Thus, a significant downward variance from the advisory guideline range is sufficient to meet the goals of sentencing.

With respect to the goal of deterrence, the collateral consequences listed above along with a supervisory sentence with conditions, such as computer restrictions and required treatment, is sufficient to meet that goal as well.

Production of child pornography in countries outside our borders have made investigating and/or arresting producers nearly impossible. See United States v. Stern, 590 F. Supp.2d 945, 952 n.5 (N.D. Ohio Dec. 19, 2008) ("[N]o court should be deluded into believing that limiting domestic consumption alone can eradicate the international market for child pornography"). The widespread availability of the internet, coupled with the affordability of computers and digital recording equipment have made production easy, widely accessible, and largely anonymous.

As a result, there are tons of child pornographic images

available for free on the internet and prosecuting people who

receive these images does nothing to curtail the production of

these images because there is no financial link between the

possessors and the producers. Likewise, there is no indication

that a harsher penalty would curtail more people from receiving,

viewing, or possessing child pornography. As Judge Bennett

stated in <u>United States v. Beiermann</u>, 599 F.Supp.2d 1087, 1103-

04 (N.D. Iowa Feb. 24, 2009):

> **[T]here is not a sliver of evidence in this
> sentencing record remotely supporting the
> notion that harsher punishment would reduce
> the flow of child pornography on the
> Internet.  From the rapid growth of these
> cases that my colleagues around the country
> and I are seeing, we cannot sentence
> Internet users and sharers of child
> pornography fast enough or long enough to
> make a dent in the availability of such
> material on the Internet .. . [this]
> sentence should not be longer simply to
> satisfy an objective that, while laudable,
> is not being achieved according to any
> empirical or other evidence in this case or,
> for that matter, empirical evidence in any
> other case or source that I am aware of."**

It is hard to imagine that requiring sex offender

registration and a term of supervised release along with a

significant downward variance from the advisory guideline range

would make it more likely that others are going to possess child

pornography. Consequently, the goal of general deterrence can be

sufficiently met by imposing a below the advisory guideline

sentence along with a period of sex offender registration and supervision by the Probation Office.

Chris's test results and evaluation performed by Dr. Delmonico and Ms. Griffin, along with a minimal criminal history, make him less likely to recidivate, and there is no need to protect the public from further crimes committed by him. As a result, he lands into criminal history category I, which makes it far less likely that he will recidivate. According to the United States Sentencing Commission's May 2004 Report, "Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines," at 12 and at http://www.ussc.gov/publicat/Recidivism_General.pdf "[r]ecidivism risk increases with each [Criminal History Category ("CHC")] . . . offenders in CHC I have a substantially lower risk of recidivating within two years (13.8%) than offenders in CHC VI (55.2%)." Generally, the longer the criminal record, the more likely the offender recidivates. Chris is in criminal history category I; consequently, he is in the criminal history category with the lowest recidivism rate. In addition, he has not re-offended since being charged in this matter.

On March 24, 2015, Justice Anthony M. Kennedy condemned our reliance on lengthy incarcerations and remarked to the United States House of Representative Appropriations Committee, that "it would be wiser to assign offenders to probation and other

41

supervised release programs." Jess Bravin, Wall Street Journal, *Two Supreme Court Justices Say Criminal-Justice System Isn't Working*, *available at* http://www.wsj.com/articles/two-supreme-court-justices-say-criminal-justice-system-isnt-working-1427197613.

Recently, the Bureau of Prisons issued an annual determination of the average cost of incarceration. The average cost to incarcerate an individual in the BOP or community correction facility is 7 to 9 times higher than the average cost to supervise that person in the community after sentencing.

|  | Bureau of Prison Facility | Community Corrections Facility | Supervision in Community |
|---|---|---|---|
| Daily | $87.61 | $71.46 | $10.71 |
| Monthly | $2,664.80 | $2,173.58 | $325.75 |
| Annually | $31,977.65 | $26,082.90 | $3,909 |

BOP, Annual Determination of Average Cost of Incarceration (July, 19, 2016), *available at* https://www.gpo.gov/fdsys/pkg/FR-2016-07-19/pdf/2016-17040.pdf; *see also* United States Courts, *Did You Know? Imprisonment Costs 8 Times More than Supervision* (June 18, 2015), *available at* http://www.uscourts.gov/news/2015/06/18/did-you-know-imprisonment-costs-8-times-more-supervision.

IV.   **CONCLUSION**

Christopher Woods is a 46 year old man who made extremely bad choices while undergoing a very difficult time in his life. He has a minimal criminal history and has a lengthy work history including managerial positions. He is in a long-term relationship, is close to his family and is involved with his children. He downloaded a file sharing program which ultimately led him to view child pornography and made a horrible mistake and readily admitted involvement to the authorities. Chris has been evaluated by experts and found not to be a pedophile or risk of further similar offenses, nor does he have an anti-social personality disorder. The purposes of sentencing would be more than adequately served by a significant downward variance from the advisory guideline range combined with restrictions set by the Court, including the requirement of community-based treatment and a term of supervised release along with sex offender registration. Society and Chris

43

would pay a dear cost for a lengthy prison sentence and receive very little in return.

Given the unique circumstances of this case, a significant downward variance from the advisory guideline range is appropriate in this case.  Such a sentence would be sufficient but not greater than necessary to meet the goals of sentencing.


                              Respectfully submitted,


                              **s/ Jay J. Finkelstein**
                              Jay J. Finkelstein
                              Assistant Federal Public Defender
                              Attorney I.D. No. 42943